VINCENT T. LANNA ET AL. *v.* HAROLD GREENE ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued March 9—decision released July 25, 1978

*Norris L. O'Neill,* for the appellants (plaintiffs).

*Miles F. McDonald, Jr.,* for the appellees (defendants Harold and Jean R. Greene).

LONGO, J.  The plaintiffs, Vincent T. Lanna and Robert G. Hayduk, complained that the defendants Harold and Jean R. Greene wilfully breached a contract to convey real estate to them; that by leasing the premises to the defendant Mutual Tennis, Inc., hereinafter Mutual, the Greenes conspired with Mutual to encumber the premises and prevent the plaintiffs from acquiring title; and that the lease to Mutual was invalid.  The plaintiffs sought punitive and compensatory damages, a decree setting aside Mutual's lease and enjoining Mutual from use of the premises, and a decree that the Greenes specifically perform the purchase and sale contract to the extent of their ability to convey.  From a state referee's judgment in favor of the defendants, the plaintiffs have appealed to this court.

The referee found the following:  The Greenes were the owners of land in Stonington consisting of six and one-half acres.  On or about June 18, 1973, the Greenes granted an option to lease about three and one-half acres of the premises to Cross Court–

Mystic Associates, a business one and the same as Mutual for all practical purposes. The option agreement included a lease executed by the Greenes which was to have full force and effect if executed by Mutual in the exercise of the option. The option was recorded in the Stonington land records on December 21, 1973, about the time that the plaintiffs began negotiating with Harold Greene to purchase the property for development of tennis facilities. The plaintiffs were aware that there was an option to lease the property and that the option was effective through February 28, 1974. Mutual submitted a zoning application for tennis facilities to the Stonington authorities on January 16, 1974. The application was a matter of public record and the plaintiffs could have seen it had they gone to the building department and inquired.

On February 27, 1974, Mutual's president telephoned the Greenes' office and notified an employee that Mutual was exercising its option to lease and was sending a letter and a check in accordance with the terms of the option and the lease. Harold Greene received the letter and enclosed check on March 2, and returned them to Mutual on March 11 because he felt that the option had expired. On or about March 12, the plaintiffs and the Greenes executed a purchase and sale agreement which provided that if the Greenes were unable to deliver good and marketable title by September 1, 1974, subject to a thirty-day extension to cure, the plaintiffs could elect either to accept title subject to encumbrances with no reduction in the purchase price, or to reject title and recover their deposit.[1] Mutual's lease was

[1] "If, at the said time of closing, the Seller is unable to convey good and marketable title, the Buyer shall have the option of: A. Accepting such title as the Seller can then convey without change in the purchase price, or B. Declare an unwillingness to accept such

recorded on March 18, but the Greenes continued to treat it as invalid. On April 1, Mutual commenced suit for specific performance against the Greenes, who informed the plaintiffs of this problem. After receiving advice from counsel that the lease was valid, in May the Greenes notified the plaintiffs' attorney and the Stonington authorities that they would honor the lease.

Contrary to the provisions of the purchase and sale agreement, the plaintiffs did not furnish the Greenes with drawings and plans for a tennis complex, did not attempt to obtain a building permit, did not apply for a mortgage commitment, and did not conduct a title search or notify the Greenes in writing of a defect in the title. It appears that the Greenes were willing to sell the premises to the plaintiffs at the purchase price, subject to whatever rights Mutual had, but that the plaintiffs were unwilling to buy on those terms. The plaintiffs brought this suit when Mutual began to construct tennis facilities on the property.

From the foregoing findings, the referee concluded that the Greenes' inability to convey good and marketable title to the plaintiffs was not due to their fault or collusion or bad faith; that the parties had a right to rely on the remedies provided by contract if the Greenes were unable to deliver good and marketable title; that under the circumstances the contractual remedies were exclusive and the plaintiffs were not entitled to damages or to

title, whereupon this agreement shall terminate and the Buyer shall, in addition to any other rights herein given, become entitled to the return, without interest to said time, of the deposit paid on account hereof and all rights of the parties hereunder shall terminate and cease."

specific performance in whole or in part; and that the plaintiffs lacked standing to attack the validity of the lease to Mutual.

The plaintiffs' first claim on appeal is that the referee erred in expressing the opinion, in the memorandum of decision, that the contract had been rescinded by the acts of the parties, when that defense was not pleaded or raised at trial. See Practice Book, 1963, § 120; *Pawlinski* v. *Allstate Ins. Co.,* 165 Conn. 1, 6, 327 A.2d 583. There is no merit to this claim. While we may properly consult the memorandum of decision to ascertain the grounds upon which the referee acted, it establishes no facts and cannot take the place of a finding. *Schnier* v. *Commissioner of Transportation,* 172 Conn. 427, 428, 374 A.2d 1087. In the event of conflict between a memorandum of decision and a finding, the latter must always prevail. *Silver* v. *Silver,* 170 Conn. 305, 307, 365 A.2d 1188. The referee's judgment should stand if it is responsive to the issues and supported by the finding, notwithstanding the reference to rescission. *Malone* v. *Steinberg,* 138 Conn. 718, 723, 89 A.2d 213; Maltbie, Conn. App. Proc. § 36.

We next consider whether the referee properly decided that under the circumstances the plaintiffs were limited to their contractual remedies and had no right to specific performance or damages for breach of the contract. In a proper case a vendee is, of course, entitled to damages for breach of a contract to convey land. *Gray* v. *Greenblatt,* 113 Conn. 535, 537, 155 A. 707; *Makusevich* v. *Gotta,* 107 Conn. 207, 210, 139 A. 780. A vendee may elect in the alternative to have the contract specifically performed to the extent of the vendor's ability to comply, with an

abatement in the purchase price if appropriate, subject to the qualification that specific performance is a form of equitable relief which rests in the sound discretion of the court. *Schneidau* v. *Manley,* 131 Conn. 285, 289, 39 A.2d 885; see *Texaco, Inc.* v. *Rogow,* 150 Conn. 401, 411, 190 A.2d 48. It is also fundamental, however, that vendor and vendee may contract to limit their remedies for breach. *Ritucci* v. *Brandt,* 134 Conn. 364, 366, 57 A.2d 728.

Relying on this rule of law, the Greenes maintain that under the circumstances of this case the remedies provided by the contract are the only remedies available to the plaintiffs. The plaintiffs deny that the contractual remedies are exclusive, chiefly on two grounds: (1) they are solely for the protection of the buyer and may, therefore, be waived by the buyer; (2) even if the contractual remedies are for the benefit of both buyer and seller, they may not be invoked by the seller if he has failed to disclose an encumbrance on the property, or if he has encumbered the property subsequent to the execution of the contract.

The general rule is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision. 3A Corbin, Contracts § 761. We do not agree, however, with the plaintiffs' contention that the remedies provided in this contract were intended solely for their benefit. A real estate contract, like any other agreement, must be considered as a whole and each part of it must be given effect if possible. The words used by the parties must be accorded their common meaning and usage where they can be sensibly applied to the subject matter of the agreement. If the terms of the contract are fairly susceptible of two or more interpretations, the one which is the more equitable, rea-

sonable and rational is to be preferred. *Texaco, Inc.* v. *Rogow,* 150 Conn. 401, 408, 190 A.2d 48. Here, the contract provides that in the event that the Greenes are unable to deliver good and marketable title at closing, the plaintiffs are to have two options—each prefaced by the mandatory word "shall." The plaintiffs could either (a) pay the full purchase price and accept title with the encumbrance, or (b) reject title and obtain a refund of their deposit. The plain intention of the contract is to compel the plaintiffs to choose between those remedies and no others. This interpretation is buttressed by the circumstances attending the making of the contract. There had been a recent attempt by Mutual to exercise its option to lease. Although the Greenes believed the lease to be invalid, it would be illogical to presume that they were heedless of the problems that might occur if Mutual insisted on asserting its rights under the lease. Construing the agreement equitably and as a whole, we conclude that the contractual remedies were intended for the benefit of the Greenes as well as the plaintiffs.

The authorities cited by the plaintiffs in support of the proposition that such "termination clauses" may be waived unilaterally by the vendee are factually distinguishable from the present case. *Mitchell* v. *White,* 244 Ala. 603, 14 So. 2d 687; *Kubicek* v. *Way,* 102 So. 2d 173 (Fla. App.); *Hunt* v. *Smith,* 139 Ill. 296, 28 N.E. 809. To the extent that those cases are inconsistent with our interpretation of the contract, we do not follow them. We agree, instead, with the reasoning of *Old Colony Trust Co.* v. *Chauncey,* 214 Mass. 271, 273, 101 N.E. 423, which interpreted a similar termination clause as governing the rights and obligations of both parties to a purchase and sale agreement, if title proved to be

defective without "fault" on the part of the vendor. That case has been repeatedly followed in Massachusetts. See *Sawl* v. *Kwiatkowski,* 349 Mass. 712, 212 N.E.2d 228, and the cases cited therein.

The plaintiffs claim that the Greenes were at fault in that prior to the execution of the contract they knew of the purported lease but failed to disclose it, and subsequent to contracting they wilfully relied on the lease as an excuse for not performing the contract. Such conduct would, if proven, be sufficient to bar the Greenes from invoking the protection of the termination clause. See *Lafond* v. *Frame,* 327 Mass. 364, 99 N.E.2d 51.; *Oberg* v. *Burke,* 345 Mass. 596, 188 N.E.2d 566; *In re Craven's Estate,* 169 Pa. Super. 94, 82 A.2d 60. The plaintiffs, however, have failed to prove their claims of fault.

The plaintiffs concede they were aware that there was an option to lease the premises in question and that it was effective through February 28, 1974. They deny that prior to the execution of the purchase and sale agreement on March 12, they were aware that an attempt had been made to exercise the option. The Greenes' brief, however, references testimony and exhibits sufficient to support the referee's finding that at all times the plaintiffs knew about the lease and were continually advised about the lease. While stated among the conclusions, the referee's determination amounts to a finding of fact and as such it is to be tested by the evidence. *Fox* v. *Schaeffer,* 131 Conn. 439, 442, 41 A.2d 46; *Aetna Ins. Co.* v. *Blumenthal,* 129 Conn. 545, 550, 29 A.2d 751.

The Greenes' conduct subsequent to the execution of the contract likewise cannot be said to show fault.

Having already returned Mutual's check and letter in the belief that the option had expired, they refused to accept the lease until they were named as parties defendant in an action for specific performance commenced by Mutual on April 1, 1974. They notified the plaintiffs of Mutual's lawsuit on April 8. They engaged the services of an attorney, and only upon his advice that the lease was valid did they finally agree to honor it. They remained willing to sell their property to the plaintiffs encumbered by whatever interests Mutual had.

So far as it concerns the issue of the Greenes' fault, the referee's finding is not subject to correction. The facts found are supported by the evidence, and the plaintiffs' draft findings are either not admitted or undisputed, or immaterial to the outcome. *Arcari* v. *Dellaripa*, 164 Conn. 532, 534, 325 A.2d 280. We will not disturb the referee's conclusions that the Greenes' inability to convey good and marketable title was not due to their fault or collusion or bad faith, and that they were entitled to rely on the remedies provided by contract.

There remains the question of the referee's refusal to determine the validity of Mutual's lease, claimed by the plaintiffs to be defective under the Statute of Frauds and for other reasons. Under the doctrine of equitable conversion a contract for the sale of land vests equitable title in the vendee. *Rienzo* v. *Cohen*, 112 Conn. 427, 431, 152 A. 394; 3 American Law of Property § 11.22. This interest in the property was sufficient to give the plaintiffs standing to challenge Mutual's lease. See 71 Am. Jur. 2d, Specific Performance, § 190; 92 C.J.S., Vendor and Purchaser, § 319. The referee erred in concluding otherwise.

The ruling was harmless and immaterial so far as the plaintiffs' rights against the Greenes are concerned, in view of the exclusivity of the contractual remedies and the Greenes' lack of fault. Whether the lease is valid or invalid, the plaintiffs can demand no more of the Greenes than the return of their deposit or the delivery of such title as the Greenes can convey without change in the purchase price. But the referee's ruling precluded the plaintiffs from exercising their right to set aside Mutual's allegedly invalid interest in the land. That right arises by operation of law, under the doctrine of equitable conversion. It is unrelated to the contractual remedies between buyer and seller and the contract does not purport to deny it.[2] Had the legality of the lease been adjudicated, the plaintiffs would have been in a position to choose intelligently between the two remedies provided by the contract. As matters stand, the plaintiffs instead face the unsatisfactory alternatives of paying the full purchase price for land that is perhaps so encumbered as to be of little value to them, or recovering their deposit and losing the benefit of what might have been an advantageous bargain. Such a result is inconsistent with the rights of a vendee under the equitable conversion doctrine and is not called for by the contract. There must be a remand for the limited purpose of determining the validity of the lease to Mutual.

---

[2] Because of the posture of this case on appeal, we need not reach the question of whether, under the terms of this contract, the plaintiffs could have delayed their election of remedies pending a determination of the validity of the encumbrance. The record does not reveal that the defendants Greene demanded such an election on the performance date; moreover, had the referee not ruled erroneously that the plaintiffs lacked standing to challenge the validity of the lease, they would have had the benefit of a ruling on its validity at the conclusion of the trial.

There is error in part, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other judges concurred.